IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2021

## IN RE GREYSON D. ET AL.

**Appeal from the Juvenile Court for Roane County**
**No. 2019-JC-194     Terry Stevens, Judge**

_____

**No. E2020-00988-COA-R3-PT**

_____

A mother appeals the termination of her parental rights on the grounds of severe abuse and failure to manifest a willingness and ability to assume custody and on the determination that termination is in the best interests of her children.  Upon our review, we discern no error and affirm the termination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Allison M. Rehn, Harriman, Tennessee, for the appellant, L.O.

Herbert H. Slatery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

L. O. ("Mother") and Thomas D. ("Father") are the parents of Greyson D., born in October 2018, and Mason D., born in September 2019.[1]  Each child tested positive for drugs at the time of his birth, prompting the involvement of the Tennessee Department of Children's Services ("DCS").  Greyson was placed in foster care shortly after his birth due to Mother's admitted use of cocaine and methamphetamine during her pregnancy, but the

---

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

parents were able to regain custody. Mason's positive drug test at his birth and parents' admitted drug usage prompted DCS to remove both children from the parents' care and to file a petition alleging that the children were dependent and neglected. The juvenile court entered an emergency protective order placing the children in DCS custody on September 27, 2019; they have remained in foster care since then. When Greyson entered foster care this second time, he again tested positive for drugs, specifically methamphetamine.

On November 7, 2019, DCS filed a petition to terminate the rights of Mother and Father.[2] As to Mother, the petition alleged that termination was warranted on the grounds of severe abuse due to her drug usage during her pregnancies with both children and her failure to manifest an ability and willingness to assume custody of the children. The petition also alleged that termination was in the children's best interest.

On November 26, 2019 DCS filed a motion to suspend parents' visitation, citing their refusal to submit to random drug screening on October 24 and November 14, 2019, and also because of Father's "extremely unusual behavior including profuse swearing, crying, and screaming[, and] . . . talking constantly but not making sense" during an October 24 home visit conducted by the DCS caseworker and her team leader. The motion also stated that neither parent had completed an alcohol and drug assessment or engaged in any form of substance abuse treatment, causing DCS to be "concerned that the[] parents are continuing to use methamphetamine and therefore are potentially continuing to expose the children to methamphetamine during supervised visitation." DCS asked the court to suspend the parents' supervised visitation until the parents "submitted to an alcohol and drug assessment and begin compliance with treatment recommendations" and to require the parents to "submit to all random drug screens and to submit to a drug screen two hours prior to each supervised visitation session." No order on the motion appears in the record.[3]

On or about December 23, 2019, the juvenile court found that the parents had committed severe child abuse against each child due to their knowing exposure of the children to methamphetamine.[4] At that time, the court also relieved DCS of providing

---

[2] This appeal only concerns the parental rights of Mother. Like Mother, the trial court terminated Father's parental rights following a trial, and Father appealed to this Court. Due to Father's failure to file a brief on appeal, despite extensions from this Court allowing him the opportunity to do so, however, his appeal was dismissed. As a result, we discuss Father only to provide context for our consideration of Mother's appeal.

[3] An order on the motion prohibiting visitation was apparently entered in December 2019, as it was discussed at trial by the DCS case worker, and the permanency plan references it. An order entered on April 27, 2020, states that "visitation shall continue as previously ordered."

[4] Due to the incredibly short amount of time between the second removal and the filing of the termination petition in this case, at the time the December 23, 2019 severe abuse order was entered, a termination petition had already been filed. It has generally been held that "[t]he exclusive jurisdiction of juvenile court is super[s]eded when a petition for termination of parental rights is filed in another court with concurrent jurisdiction to make that determination." *State v. R.S.*, No. M2002-00919-COA-R3-CV, 2003 WL 22098035, at *19 (Tenn. Ct. App. Sept. 11, 2003); *see also, e.g., In re DMD*, No. W2003-00987-COA-

reasonable efforts to reunite the children with their parents and ordered the parents to have no contact with the children. The children were moved to a pre-adoptive foster care placement in late January 2020.

A permanency plan was created on April 13, 2020 and ratified by the court on April 27. The plan required Mother to submit to random drug tests, undergo an alcohol and drug assessment and a mental health assessment, and attend a parenting class. Mother was also to obtain and provide proof to DCS of a legal source of income and of safe and stable housing. An order entered on April 27, 2020 following a permanency hearing indicates that DCS had been relieved of making reasonable efforts; that DCS was "in substantial compliance" with the permanency plan; that the court was reserving ruling on Mother's compliance "due to the current COVID-19 pandemic and the Court's limitation on conducting in-person hearings at this time"; but that "progress toward resolving the reasons the children are in foster care has not been made in that there has been a lack of progress under the permanency plan."

The juvenile court held a hearing on the petition to terminate on June 17, 2020, at which four witnesses testified: on behalf of DCS, the DCS case manager and the person who supervised visitation testified, while Mother and Father each testified on their own behalf.

Kaitlyn Stutz, a foster care case manager with DCS, testified that Greyson had previously been in foster care for three or four months following his October 2018 birth due to a positive drug test and Mother's admitted use of cocaine and methamphetamine during her pregnancy. When Mason was born in September 2019, he tested positive for amphetamines, which, according to Ms. Stutz's testimony, prompted DCS's involvement with the family and the children's removal. When the older child, Greyson, entered foster care this second time, Ms. Stutz testified that he "was inconsolable" and "seemed to be in a lot of pain." Based on these behaviors, a hair follicle drug test was performed, and he tested positive for methamphetamines. The parents were also drug tested, and both tested positive for methamphetamine, amphetamine, and THC. Ms. Stutz testified that during home visits, she had concerns about the home itself, reporting that "there was flies and there was cat feces and other things in the bathroom," which "smelled of urine."

Ms. Stutz testified that in order for the parents to demonstrate that they had the ability to care for the children, they needed to "[f]irst, make sure that they are going through a substance abuse program and that they are clean and not using drugs anymore . . . [;]

R3-PT, 2004 WL 1359046, at *6 (Tenn. Ct. App. June 17, 2004). In this case, however, it appears that the termination petition was not filed in "another" court; both proceedings were filed in Roane County Juvenile Court. No issue has been raised concerning this circumstance, and there can be no dispute that the trial court had jurisdiction over the termination proceedings.

make sure their home is appropriate and safe[;] and also make sure that they have the parenting skills they need." Ms. Stutz testified that she had asked the parents to do those things at the beginning of this case but that the parents had made no progress in this regard, and that, given the fact that the same things had been requested of the parents during Greyson's initial DCS custody interval following his birth, she did not believe they had the ability to make the changes and take the steps necessary to enable them to care for the children in a safe way. Ms. Stutz testified that the parents did not complete any of the items on the parenting plan other than visiting with the children twice in October 2019. She clarified that the parents told her they completed the alcohol and drug assessment, but they did not complete the necessary forms to enable Ms. Stutz access to their results or records for verification. Ms. Stutz testified that Mother tested positive for drugs when she administered drug screens on October 3 and 18, 2019. On October 24, 2019 Ms. Stutz attempted to administer a drug test, but Mother could not produce a sample.

Ms. Stutz stated that Mother had never produced a clean drug screen; that she "texted [Mother] on a regular basis and ask[ed her] to come to the office for different things, including drug screens" before being relieved of providing reasonable efforts in late December 2019. She also testified that she had concerns that Mother was still under the influence of drugs when she "seemed very drowsy or sleepy" during Child and Family Team Meetings, home visits, and also during interactions with Mother at court. In response to that testimony, Mother later testified that if she appeared drowsy or sleepy, it was because she is "normally really quiet" and "like[s] to soak things in to listen," and that she never attended any meeting at DCS under the influence of anything. A drug screen collected on the day of the in-person Child and Family Team Meeting on October 3, 2019, reflects that Mother tested positive for methamphetamine and THC Metabolite, though she reported she had last used those drugs five days before, on September 29, 2019.

With respect to the parents' transportation issues, Ms. Stutz testified that she transported them to the first meeting and gave them "ample time before the meetings to plan transportation by asking friends or ETHRA [East Tennessee Human Resource Agency]. . . services," which she "offered to [the parents] to transport them." She also testified that the parents initially reported that they were sharing a car with Father's father and requested gas cards to cover the costs of their transportation, which Ms. Stutz said DCS was able to provide, if parents completed a budget form, which they never did. Ms. Stutz reported that on days she attempted to randomly drug screen the parents, she would notify them in the morning and give them until 4:30 in the afternoon, when the office closed, to come in and be tested, but the parents never showed up for the drug tests.

Concerning the parenting classes, Ms. Stutz testified that the parents were supposed to start parenting classes with a different provider than Heather Cambron, a family support specialist with Omni Community Health who supervised their visitation and had previously provided their parenting classes during the last custodial intervention, because DCS "wanted them to do something different than just redoing the same parenting program";

however, the classes had already begun and the parents were not able to start those classes mid-session, so they were to start with the next session in January 2020.

Ms. Stutz testified that the children "have a really good bond" with their foster parents, who want to adopt them; that they are the only children in the foster home and that each boy has his own room; and that all of their needs, including their medical and therapeutic needs, are being met. According to Ms. Stutz, Greyson turns to his foster mother "when he's upset, when he's happy, just . . . for the attention or for the reassurance and . . . direction." Mason was described as being "a very happy baby" who "smiles all the time and giggles all the time," and who is "starting to sit up and hopefully crawl soon." Ms. Stutz relayed that the foster mother "has been great about getting [the children] to appointments and therapies that they may need."

Ms. Cambron testified that she served as the Omni case worker providing parenting education during Greyson's initial custodial encounter with DCS after his birth in October 2018 and that she provided therapeutic visitation in the present case, for which DCS paid. Ms. Cambron testified that the parents participated in two visits in October 2019, but when she attempted to schedule the two visits for November, "the parents had car troubles . . . [and] asked to move the visitation." When a subsequent date was found that worked for the parents and the foster mother, the visit ultimately had to be cancelled when the parents refused to take a drug test. She testified that the parents' transportation issues again prevented a visit from occurring in early December 2019. When she later attempted to schedule a visit, "the parents responded and said that they were struggling with the parenting class but never acknowledged that [she] had said anything about visitation." When she attempted to contact them a day or two later on December 19 or 20, 2019 about visitation, "there was no response."

Ms. Cambron testified that the parents' interactions with the children at the first visit "went well" and the parents "were accommodating," such that they "fed the kids, changed the diapers, and all that" after having brought "formula and the diapers and everything that they would need." Ms. Cambron noted that Mother had texted her before the visit "to find out exactly what kind of formula that Mason was drinking and then if Greyson was still using almond milk." Also, the first visit took place around Greyson's birthday, so she recounted that the parents brought him presents, including a couple of toys, which "they tried to get him to play with those toys, and you know, engage with those toys, and he just didn't show any interest." Ms. Cambron observed that Greyson "just wanted to be left alone" and "didn't want anybody touching him." At the next visit, "they were able to play with him a little more" and hold him.

Ms. Cambron described Mother as being on time for the visit and "really excited to see [the children]," saying that she "immediately went up to the van that the foster mom was driving and . . . helped . . . get them out of the car seats, and she hugged them both." During the visit, Ms. Cambron testified that Mother "was able to show them attention,"

and "played with them." After the visit, Mother helped strap the children back into their car seats.

Ms. Cambron testified that "[Mother] confide[d] in [her] and sa[id] that they were, you know, still using THC," though she did not observe any concerning behaviors or signs to indicate that Mother was under the influence at the time of visitation. She testified that the fact that the parents and children tested positive for methamphetamine was "concerning . . . because they have been through this once before, so they know, you know, the process . . . [and] what kind of work it takes to get your children back."

Mother testified that the visits went "awesome," though Greyson not wanting to be held "broke mine and [Father's] heart[s]." She also said that seeing Greyson at the first visit with a "full-body, head-to-toe rash" "literally crushed [her] soul seeing [her] son like that because he looked like he was in pain." Mother testified that she held, bounced, burped, cuddled, and changed Mason's diaper during the visit.

When asked to explain why she refused to submit to drug tests that DCS attempted to collect at her home in November 2019 so that she could have visitation with her children the following day, Mother testified that it was because

> [The DCS supervisor] came in very irate, and I don't respond well to negativity like that . . . . I told her to get the hell out because you're not going to disrespect me in my own home. . . . I kicked her out of my house. It's just her screaming at me and her being irate caused me to just tell her to get the hell out of my house, which, yes, it was childish of me, but I don't respond well to things like that.

Mother testified that she is an addict but is also a "product of [her] environment." She cited the apartment complex she and Father live in as the problem, where "major drug dealers" were their next-door neighbors, which made her susceptible to doing drugs, and asked, "What am I supposed to do? . . . Lock ourselves up in the house, not talk to anyone, not go anywhere, not associate with anybody, when we have no one or know anyone around here?"

Mother testified that she has not completed any programs to address her drug addiction issues, nor had she completed the parenting classes. Though she stated that the DCS case workers said they could "try to get [the parents] into a rehab" following the last refused drug screen, Mother testified that she said she would consider it "when everything wasn't so frantic at the house." She testified that she never followed up on the rehab offer from DCS. Mother stated that she went to visit family in her hometown in New York state for a couple of months prior to the trial, and while there, tried to get into a detox program there, which she described as a "small, little facility" that operated on a "first come, first served" basis such that "[i]f you're not there on time, you're kind of . . . out of luck until

the next bed is open." She testified that on the day of trial, she had been back in Tennessee for one week and had not been able to receive any services and also admitted that she "might have marijuana in [her] system" and would test positive for marijuana if she submitted to a drug screen.

With respect to the parents' transportation issues, Mother testified that she and Father do not own a vehicle and that she did not have a driver's license, which keeps her from inappropriately driving and picking up criminal charges. She said that Father's father lived with them after he was released from incarceration on probation and that they relied on him for transportation, but when he moved out, it "completely F'd [them] on transportation" and affected their ability to get to visitation in November 2019 and to appointments relating to their drug and alcohol assessment. She testified that they explained their transportation difficulties to the DCS team but "were actually never told about the gas cards or all of that in the beginning" or in either of the first two Child and Family Team Meetings, and that "it wasn't until [their] second court date" that the gas cards were mentioned. She also testified that on the two occasions Ms. Stutz called them in for a meeting, she and Father were "[working on] a roof . . . all the way the other side of Rockwood[, and t]here was no way that at 2:30, maybe it was, that she had called, or somewhere around that time, that we were going to be able to make it from there . . . before the offices closed." When asked if she offered to go another time for the requested drug screen, Mother testified:

> Yeah. But it was like: You either get there today or it's an automatic fail. I mean, I was on a job. I thought that's what part of the goal was, for us to work and have a source of income. I mean, what am I supposed to do? Lose a job and a source of income to go [get drug tested]. . .[?]

Mother was subsequently asked if the roofing work was a paid job, but she did not give a direct answer, stating that "[Father] was asked to help . . . one of our friends [whose] mom needed the roof redone." Mother testified that she is not currently employed, though she had "an employment opportunity" as of the time of trial that she did not want to elaborate on because she "d[id]n't want to jinx it."

As to Mother's home, she testified that she and Father lived in a one-bedroom apartment that they had previously shared with Father's father, who moved out towards the end of October 2019 because "having three people in a one-bedroom apartment . . . is a little hectic just because it's too much already just with two people." She later stated that when it was just Greyson and Mother and Father, the apartment "was perfect, comfy for us three." As to the condition of the bathroom that concerned Ms. Stutz during a home visit, Mother said that the bathroom was "very confined" and contained a shower, sink, toilet, and the cat litter box and that the window was open, which was why flies were present.

Mother testified that, as of the time of trial, she and Father were in the midst of

getting a new apartment and were "just waiting for it to be ready for us to kind of move in."[5] Mother clarified that the new apartment was currently occupied and that she and Father were waiting for the landlord, for whom Father would be providing maintenance on his properties, to evict the current occupants. Mother testified that she had never seen the apartment and thought it was "near Caney Creek or . . . in Roane County."

Mother testified that she was trying to show compliance with the permanency plan but had nothing to offer as far as documentation that would demonstrate compliance. Mother pleaded with the Court that "all [she was] asking is for some time and a little bit of faith . . . [A]ll I want is our children home."

At the conclusion of the trial, the court made findings of fact and conclusions of law and determined that the rights of both parents should be terminated. An order memorializing the ruling was entered on June 30, 2020. Mother appeals.

## II. ISSUES PRESENTED

On appeal, Mother contends that the evidence was not clear and convincing as to the ground of failure to manifest an ability and willingness to assume custody of her children or the trial court's holding that termination was in the child's best interest. Though she does not appeal the court's conclusion that the ground of severe abuse was clearly and convincingly established, we must nevertheless review the trial court's findings relative to that ground. *In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016) (holding that "in an appeal from an order terminating parental rights[,] the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (collecting cases). However, those rights are not absolute and may be terminated in certain circumstances. *See Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982); *State Dep't of Children's Serv. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence," which "enables the fact-finder to form a firm belief or conviction

---

[5] Father testified that he and Mother were moving because they were being evicted from their current apartment. He explained that their possessions were already packed up, though he planned to go to court two days later "to fight [the eviction notice in order] to stay there for maybe ten more days so I can get out."

- 8 -

regarding the truth of the facts, . . . eliminates any serious or substantial doubt about the correctness of these factual findings[, and] ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* at 522 (citations and quotations omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Tennessee Code Annotated section 36-1-113[6] sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in section 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are proven, the petitioners then must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

In termination cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). Any "other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness." *Id.* (citation omitted).

## IV. ANALYSIS

### A. Grounds for Termination

#### 1. Severe Abuse

In Tennessee, a court may terminate parental rights when:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

---

[6] The version of section 36-1-113 in effect when the termination petition was filed in this case does not differ from the version currently in effect in any way that affects the outcome of this case.

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as: "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(27)(A)(i). "[A] mother's prenatal drug use constitutes severe child abuse 'whether or not the child actually sustains harm.'" *In re Seth Mc.*, No. M2017-02562-COA-R3-PT, 2018 WL 3060366, at *11 (Tenn. Ct. App. June 20, 2018) (quoting *In re Douglas H.*, No. M2016-02400-COA-R3-PT, 2017 WL 4349449, at *9 (Tenn. Ct. App. Sept. 29, 2017)).

In this case, the order terminating Mother's parental rights states that the juvenile court found in December 2019 that Mother "had perpetrated severe child abuse on each of these children due to their exposure to methamphetamine." The December order containing this finding does not appear in the record before us,[7] but Mother does not contest that the order was entered and was never appealed. *See Jackson v. Smith*, 387 S.W.3d 486, 492 (Tenn. 2012) (holding that res judicata could be applied even in the absence of the subject order when the party against whom the doctrine was raised conceded to the finality of the prior order). Mother further does not contest that the trial court was entitled to rely on this order or that any of the elements of res judicata were not met in this case. *See id.* at 491 (outlining the elements of res judicata). The record shows that Mother and DCS were parties to the dependency and neglect case, and the issue of whether Mother committed severe abuse was litigated in that case. Therefore, the issue of whether Mother committed severe abuse is res judicata. *See In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12-13 (Tenn. Ct. App. Aug. 20, 2020); *In re Heaven L.F.*, 311 S.W.3d

---

[7] We are both troubled and perplexed by the omission of the collective exhibit containing the orders entered in the dependency and neglect proceeding from the record on appeal. Without these orders, it is difficult to adjudicate the issues raised in this appeal. In particular, the State chooses to base a significant portion of its argument on both the severe abuse order and the no contact order without ensuring that these orders were included in the record. While it is generally the appellant's responsibility to ensure a suitable record exists for his or her appeal, the Rules of Appellate Procedure provide ample opportunity for appellees to supplement the record if necessary to support their arguments on appeal. *See* Tenn. R. App. P. 24(a) & (e). Instead of actually providing a proper record, the State asks this Court to perform an archeological dig of the record to find support for the entry of these orders.

Importantly, because both the dependency and neglect proceeding and the termination proceeding were filed in juvenile court, it is necessary to determine whether the cases were separate for purposes of determining the finality of the severe abuse order. *See generally In re I.E.A.*, 511 S.W.3d 507, 514 n.5 (Tenn. Ct. App. 2016) (discussing the ramifications of this situation in the context of res judicata). In the absence of these orders, determining finality is particularly difficult. Fortunately, however, the technical record does contain the ex parte protective custody order, which indicates that it was filed under a separate docket number than the termination proceedings.

As the parties well know, this case has significant ramifications for not only the parties but two minor children who are left in limbo awaiting our resolution. Omissions like the one present in this case risk causing significant delays to our decision-making. In cases of this type, every effort should be made to ensure that this Court has all of the information necessary to perform our duty.

435, 439 (Tenn. Ct. App. 2010). Even if we were not permitted to rely on this order, however, no prior order is strictly necessary, as this ground for termination may also be found by the court hearing the termination petition. *See* Tenn. Code Ann. § 36-1-113(g)(4). The trial court in this case made additional findings that Mother "admitted to use of cocaine and methamphetamine throughout her pregnancy with Greyson" and that she "admitted to use of THC during her pregnancy [with Mason] and had not received prenatal care." These findings are fully supported by the record before us. We thus conclude that the trial court properly found that Mother's severe abuse of each child was clearly and convincingly established as a ground for termination.

## 2.      Failure to Manifest an Ability and Willingness to Assume Custody

The court terminated Mother's parental rights on a second ground for termination that exists when

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). Essentially, this statutory ground has two distinct prongs which must be proven by clear and convincing evidence:

> (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). Given this Court's previous conflicting interpretations of the first prong, the Tennessee Supreme Court recently clarified that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.* at 677 (emphasis in original) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances"; and "[p]arents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

As to the second prong, this Court has stated the following about what constitutes

"substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

In this case, the trial court found that "there is clear and convincing evidence that [the parents] have failed to manifest an ability and willingness to assume custody of the children" and that "[p]lacing the children in [the parents'] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children." The court then made findings that the parents failed to do the following: submit to drug testing, provide proof of undergoing drug and alcohol and mental health assessments, address their substance abuse problems, obtain alternate housing that was free from drug activity, or visit the children regularly until the no-contact order was put in place in December 2019.

Mother argues that she did not fail to manifest a willingness and ability to assume custody of Greyson and Mason, relying on evidence that she contends showed that she was interested in the needs of her children and engaged well with them during the two visits that occurred, as well as her "willingness to comply with the permanency plan." Her arguments do not address the second prong of this ground for termination.

Upon our review of the evidence, we conclude that clear and convincing evidence demonstrates that Mother has failed to manifest a willingness and ability to assume custody of the children. Mother testified that she wants her children home and desired more time in order to address the issues that necessitated their removal in the first place. But she also admitted that she is an addict and would test positive for drugs if tested on the day of trial. Moreover, Mother admitted that she had not followed through with addressing her substance abuse issues, as she has completed no programs to help her get sober and maintain her sobriety.[8] She remained in the same apartment for nine months after Mason's birth and removal, where drugs are apparently readily available. She also continued to live with Father, whose own admitted drug addiction resulted in erratic behavior that frightened

---

[8] We are mindful that the COVID-19 pandemic may have made formal drug treatment difficult. But that pandemic did not force Mother to use illegal drugs in the days before trial or to fail each drug test that she actually took.

the DCS workers who interacted with the family. Mother testified that she is not employed, and that she and Father were preparing to move to another home, but she could not provide the new home's precise location or when they would be permitted to move in, as they were waiting for the current tenants to be evicted. She provided no evidence as to when that might occur. Looking at Mother's lifestyle and circumstances, which are unchanged from the time the children entered DCS custody, as well as her failure to address or attempt to address any of the obstacles that prevented the children from being returned to her care, especially her substance abuse issues, we conclude that the first prong is satisfied by clear and convincing evidence.

The second prong is also clearly and convincingly established. Mother has not undergone any treatment for her addiction despite the fact that the family had previously faced a DCS custodial interval due to Greyson's positive drug test at birth. Though he was eventually returned to her care, he tested positive for drugs again after being removed from Mother's home a second time, and Mason was also born with drugs in his system. Mother tested positive for drugs each time she was drug screened during this custodial interval. She further admitted that she was still using illegal drugs even in the days before the trial that was to determine if her parental rights should be severed. Additionally, there remain other unaddressed issues regarding Mother's housing and employment situations. These outstanding issues, taken together, suffice to meet the State's burden of proving by clear and convincing evidence that placing the children in Mother's custody would pose a risk of substantial harm to their physical or psychological welfare. We therefore affirm the trial court's decision as to this ground.

### B.     Best Interest

Because the grounds for terminating Mother's parental rights are supported by clear and convincing evidence, we now consider whether the trial court erred in finding that termination was in the best interest of the children. After a ground for termination is established, "the interests of the child and parent diverge," and the court's focus shifts to consider the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The best interests of the children may not always lead to termination, even if a parent is deemed unfit by a court. *Id.*

> To determine whether termination of parental rights is in a child's best interests, the court shall consider, but is not limited to, the following factors:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Further, our Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017) (quotation marks and internal citations omitted).

Determining the best interests of a child "involves more than a 'rote examination' of the statutory factors" or simply "tallying the number of statutory factors weighing in favor of or against termination." [*In re Gabriella D.*, 531 S.W.3d] at 682 (quoting *In re Audrey S.*, 182 S.W.3d at

- 14 -

878). Each analysis must remain "factually intensive," and consideration of the factors should be rooted in each case's unique facts and circumstances. *Id.*

*In re James T.*, No. M2020-00111-COA-R3-PT, 2020 WL 7388069, at *7 (Tenn. Ct. App. Dec. 16, 2020), *perm. app. denied* (Tenn. Jan. 21, 2021).

The trial court's oral ruling contained detailed factual findings with respect to some statutory factors and indicated the weight it gave to certain factors. However, the written order does not quote or incorporate the transcript of that oral ruling. In such a situation, Tennessee law is clear that the trial court speaks through its written orders, not the transcript. *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015). Accordingly, we conduct our review on the factual findings in the written order.

The trial court found, as to factor (1), that the parents had not made changes in their conduct or circumstances, as they "are still using drugs and have not maintained sobriety," "not making progress under their permanency plan," and had "caused both of these children to be exposed to methamphetamine." Mother does not take issue with this finding, and we conclude, upon our review of the record, that the evidence does not preponderate against these findings.

With respect to factor (2), the trial court found:

> Despite help from the state like referring or otherwise providing opportunities for: mental health assessment and treatment, alcohol and drug assessment, random home visits, substance abuse treatment, random drug screens, parenting classes, ongoing case management, supervised visitation, transportation assistance, and appropriate care and supervision for the children during this and the previous DCS case, [the parents] still are using drugs, do not have appropriate housing or transportation, and have not maintained sobriety. [The parents] are not making progress under their permanency plan and have caused both of these children to be exposed to methamphetamine.

There is no evidence in the record that preponderates against these findings, and upon our review, we conclude that the evidence supports them.

The trial court's next finding reads: "Changing caregivers at this stage of the children's lives will have a detrimental effect on them. Both children have lived the majority of their lives in foster care and *have not had regular contact with [the parents].*" (Emphasis added).

Mother's arguments pertaining to the court's best interest determination center on

- 15 -

the above finding, which she contends relates to statutory factors (3) and (4). Those factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See* Tenn. Code Ann. § 36-1-113(i)(3). The fourth factor considers whether a meaningful relationship has been established between the parent and the child. Tenn. Code Ann. § 36-1-113(i)(4). Mother strongly disputes that these factors favor termination in this case.

Mother points to evidence in the record showing that her conduct toward her children was appropriate and "accommodating" during the two visits that occurred to argue that a lack of a relationship should not weigh in favor of termination "because it is a result of circumstance and not for a lack of Mother's effort or desire." She contends those circumstances include her "lack of transportation and legal barriers erected by the Court beginning December 23, 2019 [when the no-contact order was entered,] . . . which denied Mother the opportunity to develop or maintain a bonded relationship with the children."

Though Mother does not dispute that she has not had regular contact with the Children since DCS became involved, we have examined the record to see if the evidence preponderates against the court's finding. "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing **Walker v. Sidney Gilreath & Assocs.**, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); **The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.**, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).

First, we agree that Mother did not exercise regular contact with the children. Mother asserts, however, that her failure to maintain contact was based on circumstances outside her control. As an initial matter, we note that the plain language of this best interest factor does not require that Mother's failure be willful. *See* Tenn. Code Ann. § 36-1-113(i)(3). Still, Mother argues that despite her lack of contact with the children, factors (3) and (4) should not weigh in favor of termination. While we acknowledge that the no-contact order prevented Mother from further developing a meaningful relationship with her very young children,[9] we are mindful of the fact that no-contact orders are appropriate in cases where a parent's actions render it unsafe for the child to be around the parent, even if it prevents the parent from being able to establish or develop a meaningful relationship. *See, e.g.*, **In re Jeremiah S.**, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *14 (Tenn. Ct. App. Apr. 23, 2020), *perm. app. denied* (Tenn. Dec. 10, 2020) (concluding no meaningful relationship existed due to Mother's own actions because "Mother necessitated the no contact order by severely abusing the children, and thus, ma[de] it unsafe for the children to be in her custody."). In this case, Mother's lack of visitation was due to her own

---

[9] The no-contact order is not in the record, and the testimony is silent as to whether the order imposed any conditions or outlined any steps that Mother could take to regain visitation and whether Mother attempted to comply with any conditions or requirements.

actions in refusing to submit to drug tests and her inaction by failing to submit the needed information to DCS to obtain transportation assistance. Viewed from the perspective of Greyson and Mason, however, the reasons for the lack of visitation "matter little." **In re Johnathan M.**, 591 S.W.3d 546, 562 (Tenn. Ct. App. 2019), *perm. app. denied* (Tenn. Apr. 2, 2019) (quoting **White v. Moody**, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). The evidence shows that the lack of contact between Mother and children, coupled with their young ages, has resulted in the lack of a meaningful relationship. *See* Tenn. Code Ann. § 36-1-113(i)(4). Thus, factors (3) and (4) weigh in favor of termination.

We further agree with the trial court that DCS presented sufficient evidence to show that the children would likely be harmed by a change in caretakers. *See* Tenn. Code Ann. § 36-1-113(i)(5). The evidence shows that the children are well cared for in their current foster placement, with a foster mother who takes them to their various medical appointments and ensures that their medical and therapeutic needs are met. Mother, on the other hand, has not inquired about the children's appointments, does not have a vehicle or a driver's license, and failed to take the necessary steps to receive transportation assistance.[10] The record also shows that the visitation supervisor willingly rescheduled visitation several times to accommodate Mother's lack of transportation and that Mother was non-responsive to the visitation supervisor's attempts to schedule visitation in December 2019, prior to the entry of the no-contact order. The evidence also shows that Mother refused to submit to drug screens in November 2019, which, had she passed, would have permitted her to visit the children. Prompted by those failed and refused drug screens, DCS moved for a no-contact order, which, when entered, precluded Mother from being able to foster and maintain her relationship with Greyson and Mason through visitation. Given that it was Mother's own actions that prompted the suspension of visitation, which then resulted in a lack of meaningful relationship, we have little difficulty affirming the trial court's finding that a change in caretakers would likely be detrimental to the children. *See* Tenn. Code Ann. § 36-1-113(i)(5). Thus, despite the lack of clarity in the trial court's order concerning which factors were relevant to its findings, we conclude that factors (3), (4), and (5) all weigh in favor of termination in this case.

Turning to the remaining factors, the trial court found as follows:

---

[10] We acknowledge that conflicting testimony exists in the record with respect to the parents' transportation issues. Mother took the position at trial that DCS did not inform the parents early on of the opportunity to receive gas cards or vouchers for transportation via ETHRA. In contrast, DCS maintained that the parents were informed of these options as soon as the parents communicated their transportation difficulties, but that the parents failed to submit the necessary information in order to receive such assistance. There is no dispute that Mother had transportation assistance from Father's father and was able to visit her children twice in October 2019 before he moved out of their apartment later that month. Though the conflicting testimony addresses the reasons for the lack of visitation (which would bear on the willfulness of Mother's conduct, a consideration that is not expressly required by factor (3) of the best interest statute), it does not preponderate against the court's finding that there was simply a lack of "regular contact" between Mother and her children.

D. [The parents] have abused or neglected the children by causing them to be born exposed to drugs including methamphetamine, by using methamphetamine in the home of Greyson, perpetrating severe abuse on the children.

E. There is persistent drug use and activity in and around [the parents'] home.

F. [The parents] abuse drugs, rendering them consistently unable to care for the children in a safe and stable manner.

G. [The parents'] mental or emotional state would be detrimental to the children and prevent them from effectively parenting the children.

Mother makes no specific arguments disputing any of these findings. Still, we have reviewed these findings in light of the record and conclude the evidence does not preponderate against them. Importantly, DCS presented substantial proof that Mother has not taken the steps necessary to create a safe, drug-free home to which the children could return. Viewed from the perspective of Greyson and Mason, who are no longer being exposed to their parents' continued drug use and who are thriving in a safe, stable, pre-adoptive home, we conclude that the evidence in the record clearly and convincingly weighs in favor of termination of Mother's rights.

## V. CONCLUSION

The judgment of the Roane County Juvenile Court is affirmed, and this cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant, L.O., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 18 -